[Civ. No. 6840. Third Dist. Sept. 29, 1942.]

Estate of ELMER VERNON STRONG, Deceased. CLIFTON CLEAVER et al., Appellants, v. ERNEST VERNON DAVIES et al., Respondents.

Joseph T. Curley and Marvin C. Hix for Appellants.

E. G. Funke, Richard S. Munter and Carl H. Allen for Respondents.

SCHOTTKY, J. pro tem.—Elmer Vernon Strong died intestate in Butte County, California, leaving a considerable estate, and leaving no spouse, child, descendent or parent surviving him. Appellants, the so-called Cleaver claimants, are cousins of said deceased, and respondents, the so-called Davies claimants, claim to be a half-brother, half-sister, sole children of a pre-deceased half-sister, and sole child of a pre-deceased half-brother of deceased. Both appellants and respondents filed petitions to determine heirship, and, after hearing, the court found and decreed that respondents, the Davies claimants, have the relationship to Elmer Vernon Strong claimed by them, and, as such, were heirs to his estate. A motion for a new trial was denied, and this appeal is taken from the judgment and order determining that the Davies claimants are entitled to distribution.

It appears from the evidence that on January 1, 1866, John Vernon Davies and Emma J. Cleaver were married in Marion County, Oregon (the county seat of said county being Salem), and that the sole issue of said marriage was Elmer Vernon

Davies, who was admittedly the intestate, Elmer Vernon Strong; that a decree of divorce was entered in the Circuit Court of said Marion County in November, 1868, such decree granting the care and custody of said child, Elmer Vernon Davies, who was then, according to the deposition of his mother in the divorce action, twenty-two months old, to Emily I. Davies; that Emily I. Davies and William S. Strong were married in Marion County, Oregon, on October 20, 1870; that John V. Davies and Isabel Foster were married in Whitman County, Washington, on July 2, 1883.

The Davies' claimants produced eight witnesses, and we will summarize their testimony briefly.

Anna Louise Hickey, a sister of Isabel Davies, testified that her sister married John Vernon Davies in July, 1883; that she saw a good deal of him in the Endicott country in Washington; that he was engaged in the sheep, cattle, and horse-raising business, and also had a saloon; that he told her he formerly had a herd of sheep on an island in the river outside of Portland; that he and his family moved to Montana about 1891, and that the last time she saw him was in 1894; that he told her he had been married before, and had been divorced from his first wife; that he had only one child by such former marriage, a son named Elmer, who "was almost a young man" when he married her sister.

Henry Grant Baker, landlord of the apartment house in which intestate lived, testified that he had known Elmer Vernon Strong for seven years prior to his death; that on one occasion while sitting on the front porch of the apartment house, the intestate had said to the witness that he had "some half-brothers and sisters"; that respondent claimant, Ernest Vernon Davies, resembled Elmer Vernon Strong.

Charlotte Davies Hoover, one of the Davies claimants, testified that her father's name was John Vernon Davies; that to the marriage of her father and mother were born six children, two of whom died, without leaving any issue; that one daughter, Verne, and one son, Jack, died after they reached maturity, both leaving issue, which issue, together with herself and her brother Ernest Vernon Davies, are the respondents herein.

Ernest Vernon Davies testified that he was born in Montana on August 26, 1893; that his father, whose name was John Vernon Davies, died in Canada in 1908; that when he was "about five years" he went with his father to the State of Washington, and there saw a man whom his father told

him was his brother; that his father told him that he had been married before at Salem, Oregon, and divorced, and that this brother was by the woman that he had married at Salem, and was named Elmer Vernon Davies.

Thomas Walter White testified that he had met John Vernon Davies in Montana; that he had ridden every round-up with him for four or five years, and that they were "pretty warm" friends; that Davies told him that he had a son by the name of Elmer Vernon Davies, by a former wife whom he married at Salem, Oregon.

Edward O. Martin testified that he first met John V. Davies at Endicott, Washington, in 1884; that Davies was married at the time; that Davies was engaged in the sheep and cattle business, and also in the saloon business; that Davies told him he came from Salem, Oregon.

Donald Macrae testified that he first met John Vernon Davies about 1890, in Whitman County, Washington; that Davies had sheep, cattle and horses; that in 1891, Davies told him he had bought a ranch in Montana; was going to ship his sheep and outfit there; that he thereafter, in 1899, saw Davies in Montana; that in 1891, Davies told him that he had lived in the Willamette Valley, Oregon; that he had been married there at one time, and had a boy; that Davies' middle name was generally known as "Vernon"; that Davies was living with his wife, Isabel Davies, in Montana, in about 1901.

Isabel Davies testified by deposition, that she married John Vernon Davies in 1883, at Colfax, Washington; that Davies told her he had been previously married to a woman in Salem, Oregon, and that he had a son who was about seventeen or eighteen years old at time of the marriage of Davies and the witness; that he also told her about hitting the mother of said son with a boot-jack, and that his said wife had divorced him. The witness testified as to the names of her children by Davies, and also that she had divorced him, because of his drinking, about 1902.

The record in the divorce action in the case of *Emily I. Davies* v. *John V. Davies*, in the Circuit Court of Marion County, Ohio, the decree being dated November, 1866, and separation agreement between John V. Davies and Isabel Davies, dated December 18, 1901, were introduced in evidence. Appellants produced only one witness, Marion G. Cleaver, who testified as to the relationship of appellants to deceased, and who also testified that the father of Elmer Vernon Strong

was named John V. Davies, and that Emily Irene Strong divorced John V. Davies, the father of Elmer Vernon Strong.

Appellants urge numerous grounds for the reversal of the decree. The first is that the petition of the Davies' claimants does not state facts sufficient to entitle them to share in the estate. This contention lacks substantial merit. The petition sets forth the relationship of respondents, as hereinbefore set forth, and that decedent left no spouse, child, descendent or parent. No greater particularity is required because, after all, the proceeding is only one to have the court determine who are entitled to inherit the estate of deceased. Appellants themselves filed a petition to determine heirship, and both petitions were heard at the same time. All interested parties were properly before the court, and the court, after hearing the evidence, determined who the heirs of deceased were. No mere technical imperfection in the petition to determine heirship can undermine such a decree.

Appellants' second contention is that the trial court committed error in failing to make a finding as to the validity of the Oregon divorce decree. It is true that the record in the divorce case was introduced in evidence, and that appellants claimed that said decree was invalid. However, the matter of the validity of the divorce decree was not one of the ultimate facts to be determined, but was a mere probative fact. The trial court found that respondents were the heirs of the half-blood of decedent, and was certainly not required to go further and find specifically as to the validity of the divorce decree, for there was no pleading, making that an issue, that required a finding.

Appellants' third contention is that the court committed error in overruling their objections to declarations of John V. Davies as to his place of residence and place of marriage and divorce. Appellants argue that the declarations of a deceased member of a family may be given in evidence as to the fact of birth, death, or marriage, but not as to the place thereof. Appellants cite some rather ancient cases in support of this contention, but it seems clear to us that both reason and authority support the ruling of the trial court.

Section 1852 of the Code of Civil Procedure provides:

"The declaration, act, or omission of a member of a family who is a decedent, or out of the jurisdiction, is also admissible as evidence of common reputation, in cases where, on questions of pedigree, such reputation is admissible."

Subdivisions 4 and 11 of section 1870, Code of Civil Procedure, provides, as to facts which may be proved on trial:

"4. The act or declaration, verbal or written, of a deceased person in respect to the relationship, birth, marriage, or death of any person related by blood or marriage to such deceased person; . . .

"11. Common reputation existing previous to the controversy, respecting facts of a public or general interest more than thirty years old, and in cases of pedigree and boundary."

We believe that the true rule is well expressed in the following language from the case of *Wise* v. *Wynn*, 59 Miss. 588 [42 Am. Rep. 381]:

"This ruling of the learned judge was based upon the *dicta* of many authorities to the effect that while in questions of pedigree the hearsay declarations of a deceased member of a family are receivable in evidence, as to all matters of birth, death, age, marriage, and the like, declarations as to place are not. The later and better considered cases however repudiate this distinction between declarations as to place and those touching other family matters, where the inquiry is strictly one of pedigree, and the declarations as to place are not relied on as giving any right by reason of the place, but proof as to place is made merely by way of identification of the person or family. Thus in a question of settlement under the poor laws, where the right of settlement is dependent upon the place of present or former residence, hearsay declarations as to place are inadmissible; but where the question is purely one of pedigree, and the effort is to identify the particular person or family about whom the declarant was speaking, declarations as to place stand upon the same footing as any others relative to matters of family history. (Whart. Ev., § 208, and cases cited.) Manifestly this is the true rule here. There can be no reason founded in good sense for admitting the declarations of a deceased person that he has a brother named Thomas, and excluding his statement of where that brother lives. The name wholly fails to identify without identification of the place, and the one is worthless without the other. If the court below was correct in admitting any of the declarations of Charles Wise touching his family, it should have admitted them all, since they all tended to establish his own identity, and were proffered not for the purpose of basing any particular right on the place of his alleged nativity, but solely

for the purpose of showing who he was and to what family he belonged. . . .

". . . If they be not admitted, there must be in many cases a failure of justice. No man who knew Charles Wise in Virginia ever saw him here, and no man who knew him here ever saw him in Virginia, and if we reject his own statements as to who he was and whence he came, these inquiries must remain forever unanswered. If such be the rule of law, it must be impossible legally to establish the identity of very many travellers who die among strangers in distant lands, although in point of fact there may not be in any man's mind the slightest doubt as to who they were."

Professor Wigmore states in section 1501 of the Third Edition of his work on Evidence:

"The *place* of birth or death—something more than the fact of birth or death—has by some courts been thought to be an inadmissible subject. But there is no apparent reason to conclude that a statement on this topic is, from either of the above points of view, less trustworthy."

Appellants next contend that the evidence is insufficient to support the decree determining that respondents Davies' claimants are the heirs of deceased. We have already given the substance of the evidence, and we are convinced that the decision of the trial court finds ample support in the record. Indeed, in view of the fact that the evidence of respondents was virtually uncontradicted, the trial court could hardly have reached any other conclusion, unless it disbelieved the evidence of respondents. Appellants' argument is nothing more than an argument upon the weight of the evidence, and it is difficult for us to understand how appellants can contend seriously that the evidence in the instant case is insufficient.

Appellants' fifth contention is that even assuming that the deceased and the Davies' claimants had the same father, the Oregon divorce was void, and the subsequent marriage of John V. Davies void, and the Davies' claimants illegitimate, and not entitled to inherit through their father from his kindred.

Appellants point out that the laws of Oregon, in effect at the time of the divorce, and until 1911, required that in every divorce action the summons shall be served on the district attorney at least ten days before the term at which defendant is required to appear and answer, and that in this case only the complaint was served on the district attorney. Appellants argue that the decree of divorce was therefore void. There are

two answers to this argument. First, the record shows that the district attorney appeared at the trial of the divorce action and participated therein on behalf of the state. It is well settled that where a party upon whom summons is required to be served, voluntarily appears and makes a defense, the service of summons is waived. As was said in the case of *Harrington* v. *Superior Court*, 194 Cal. 185 [228 Pac. 15]:

". . . Process is waived by a general appearance, in person or by attorney, entered in the action, or by some act equivalent thereto, such as the filing of a pleading in the case or by otherwise recognizing the authority of the court to proceed in the action. (7 R. C. L. 1038, et seq.) . . . A defendant has a right to demand that process be issued against him in the manner provided by law, but if process is not so issued and he appears generally without making objection, such appearance, being the purpose of the process, confers jurisdiction of the person and the court is empowered to act in the premises."

The second answer to this argument is that in 1911, the State of Oregon amended the act in question, and in such amendment provided that all decrees of divorce theretofore granted, in which service had not been made upon the district attorney "are hereby validated and declared to be legal, if otherwise regular."

In 16 C. J. S., it is stated, at page 319:

"On the other hand, remedial legislation intended to cure mere irregularities or informalities in the proceedings of courts is not an usurpation of judicial functions. . . ."

In *Mackenzie* v. *Douglas County*, 91 Ore. 375 [178 Pac. 350, 352], the Supreme Court of Oregon said:

"It is a rule supported by a multitude of authorities that what the Legislature might have authorized in the first instance it can ratify afterwards, so long as no vested rights have intervened. . . ."

In *Gordon* v. *City of San Diego*, 101 Cal. 522 [36 Pac. 18, 40 Am. St. Rep. 73], the court said:

". . . Judge Cooley, in his work on Constitutional Limitations, at page 457, states concisely the rule on this subject, thus: 'If the thing wanted or failed to be done, and which constitutes the defect in the proceedings, is something the necessity for which the Legislature might have dispensed with by prior statute, then it is not beyond the power of the Legislature to dispense with it by subsequent statute; and if the

irregularity consists in doing some act, or in the manner or mode of doing some act, and which the Legislature might have made immaterial by prior law, it is equally competent to make the same immaterial by a subsequent law.' . . .''

In *City of Redlands* v. *Brook,* 151 Cal. 474 [91 Pac. 150], the court said:

"In the absence of constitutional restrictions, the power of the Legislature to validate past transactions which it could have authorized in advance is restricted only by the necessity of protecting vested rights. . . .''

(See, also, *City of Venice* v. *Lawrence,* 24 Cal. App. 350 [141 Pac. 406] ; *Hall* v. *Fairchild-Gilmore-Wilton Co.,* 66 Cal. App. 615 [227 Pac. 649] ; *Muncie Nat'l. Bank* v. *Miller,* 91 Ind. 441.)

Appellants argue further that the decree of divorce is also void because no findings of fact were made. Appellants cite several earlier Oregon cases which hold that a judgment without findings of fact or conclusions of law is void. But in 1932, in the case of *Glickman* v. *Solomon,* 140 Ore. 358 [12 P. (2d) 1017], the Supreme Court of Oregon reviewed such former holdings, and said:

". . . A careful analysis of the above cases, however, shows that each involved a direct attack on the judgment in question, and the legal effect of a void judgment, as distinguished from one which is merely voidable, was not considered.''

"Without doubt, the court had jurisdiction of the subject-matter and of the parties. Hence it had the power to render a judgment. If the judgment rendered was erroneous, the party whose rights were thereby affected had the remedy of appeal to correct any errors of law or irregularities in practice, but, until the same was reversed, it must be given full force and effect.''

"In the light of the authorities, we conclude that the judgment in question is not void, but is only voidable, and must be given full force and effect in a collateral attack. Previous holdings of this court to the contrary are to that extent over-ruled.''

In 15 C. J., page 960, it is said:

"[As a general rule,] the effect of overruling a decision and refusing to abide by the precedent there laid down is retrospective [, as well as prospective,] and makes the law at the time of the overruled decision as it is declared to be in the last decision; . . .''

In *Fleming* v. *Fleming*, 264 U. S. 29 [44 S. Ct. 246, 68 L. Ed. 547], the Supreme Court of the United States said:

"In *Tidal Oil Co.* v. *Flanagan*, decided January 7, 1924 [263 U. S. 444 (44 S. Ct. 197, 68 L. Ed. 382)], . . . we had occasion to consider the same issue. After a somewhat full examination, we held that, by a score of decisions in this court, a judicial impairment of a contract obligation was not within § 10, article 1, of the Constitution, since the inhibition was directed only against impairment by legislation, and that such judicial action presented no Federal question of which this court could take jurisdiction on a writ of error from a state court.

"It is urged upon us that the impairment here is legislative, in that the case turned on the effect of § 3376 of the Iowa Code, that the subsequent judicial construction of it became part of the statute, and gave it a new effect as a law. In other words, the contention is that the same statute was one law when first construed before the making of the contract, and has become a new and different act of the Legislature by the later decision of the court. This is ingenious but unsound. It is the same law. The effect of the subsequent decisions is not to make a new law, but only to hold that the law always meant what the court now says it means. . . ."

We are, therefore, unable to agree with the contention of appellants that the divorce decree was void because no findings of fact were made or filed.

Our conclusion that the divorce decree was not invalid makes it unnecessary to prolong this opinion by discussing the question of whether or not the respondent Davies claimants would be legitimate offspring of John Vernon Davies, even though the divorce decree was invalid. For that reason we will not discuss a number of other points discussed in the briefs.

■ Appellants' final contention is that the trial court erred in denying their motion for a new trial. The principal ground urged by appellants in support of their motion for a new trial was newly discovered evidence, which was an affidavit on file in the office of the county clerk of Marion County, Oregon, filed in connection with the application of John V. Davies and Emma J. Cleaver for a marriage license in which affidavit affiant stated that he knew Davies to be "above the age of twenty-one years," and Emma J. Cleaver to be "above the age of eighteen years." Appellants claimed that they had

made diligent search of the records, but had been unable to find said affidavit before the trial. Appellants have asserted several times in their briefs that this affidavit showed that the Davies named therein was only twenty-one years old at the time of the marriage, which made it highly improbable that he was the same Davies who was the father of Davies' heirs. Of course it is apparent at once that a statement that a person is ''above the age of twenty-one years'' is a far different statement from one that he is twenty-one years of age. The granting of a new trial upon the ground of newly discovered evidence is a matter largely within the sound discretion of the trial court. We cannot hold that there was any abuse of discretion in denying appellants' motion for a new trial.

The judgment is affirmed.

Thompson, J., and Adams, P. J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied November 27, 1942.